IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

ERIN MILLER,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C09-2063

RULING ON JUDICIAL REVIEW

_____

## TABLE OF CONTENTS

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   *PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     *A.*  *Burks' Medical History* . . . . . . . . . . . . . . . . . . . . . . . 5
     *B.*  *Burks' Education and Employment Background* . . . . . . . . . . . . 12
     *C.*  *Burks' Administrative Hearing Testimony* . . . . . . . . . . . . . . 12

V.   *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . 13
     *A.*  *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . 13
     *B.*  *Objections Raised by the Substituted Party* . . . . . . . . . . . . . 15
         *1.*  *The Opinions of Burks' Examining Sources* . . . . . . . . . . . 15
             *a.*   *Dr. Volarich* . . . . . . . . . . . . . . . . . . . . . . . 16
             *b.*   *Dr. Markway* . . . . . . . . . . . . . . . . . . . . . . . 17
         *2.*  *The Opinions of Gary Weimholt, Vocational Rehabilitation*
             *Specialist* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
         *3.*  *Credibility Determination* . . . . . . . . . . . . . . . . . . . 21

VI.  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VII. *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Erin Miller on December 11, 2009, requesting judicial review of the Social Security Commissioner's decision to deny Ronnie Burks' applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.[1] Miller asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and "[f]ind that the deceased Plaintiff, Ronnie L. Burks, is entitled to disability benefits under the provisions of the Social Security Act[.]"[2] In the alternative, Miller requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

On May 11, 2006, Burks applied for both disability insurance benefits and SSI benefits.[3] In his applications, Burks alleged an inability to work since April 25, 2006 due to knee and ankle pain, an inability to sit or stand for extended periods of time, limited range of motion in his elbow, and finger injuries. Burks' applications were denied on July 11, 2006. On July 31, 2006, Burks requested an administrative hearing before an

---

[1] The claimant, Ronnie Burks, died on March 23, 2009. Erin Miller is Mr. Burks surviving common law spouse. On March 31, 2009, Miller filed Form HA-539, Notice Regarding Substitution of Party Upon Death of Claimant, with the Social Security Administration. *See* Administrative Record at 6. Accordingly, Miller is the substituted party for Mr. Burks' pending appeal.

[2] *See* Miller's Complaint (docket number 1) at 2.

[3] Burks previously filed applications for disability insurance benefits and SSI benefits on July 10, 2003. Burks' applications were denied initially on September 2, 2003, and denied upon reconsideration on January 8, 2004. On January 26, 2004, Burks requested a hearing before an Administrative Law Judge ("ALJ"). Following a hearing, on April 25, 2006, the ALJ entered a decision finding that Burks was not disabled and not entitled to disability insurance benefits or SSI benefits. *See* Administrative Record at 68-76. Apparently, Burks decided not to appeal the ALJ's April 2006 decision.

Administrative Law Judge ("ALJ").[4] On August 16, 2007, Burks appeared in Columbia, Missouri, with his attorney before ALJ Craig Ellis for an administrative hearing. Burks testified at the hearing. In a decision dated April 8, 2008, the ALJ denied Burks' claims. The ALJ determined that Burks was not disabled and not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing other work that exists in significant numbers in the national economy. Burks appealed the ALJ's decision. On October 9, 2009, the Appeals Council denied Burks' request for review. Consequently, the ALJ's April 8, 2008 decision was adopted as the Commissioner's final decision.

On December 11, 2009, Miller filed this action for judicial review. The Commissioner filed an Answer on April 23, 2010. On June 25, 2010, Miller filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that Burks was not disabled and could perform other work that exists in significant numbers in the national economy. On August 24, 2010, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On September 27, 2010, Miller and the Commissioner consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3),

---

[4] Burks filed his May 2006 applications for disability insurance benefits and SSI benefits in Missouri. Both parties acknowledge that Missouri is a "prototype" state or "test" state participating in modifications to the disability determination procedure. One of these modifications, is the elimination of the reconsideration step in the administrative appeals process. *See* Miller's Brief (docket number 9) at 2, n.1; Commissioner's Brief (docket number 10) at 1, n. 1. Accordingly, Burks' appeal proceeded directly from the initial denial of his applications to the administrative hearing level before an ALJ.

the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by 'substantial evidence on the record as a whole.'" *Heino v. Astrue*, 578 F.3d 873, 878 (8th Cir. 2009) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Wagner*, 499 F.3d at 848 (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Burks' Medical History

On June 6, 2001, Burks fell off a horse and fractured his left ankle. He also injured his left knee. On June 7, Burks underwent surgery to repair his ankle and knee. The surgery was performed by Dr. Val O. Lyons, M.D. In July, Burks complained of "residual catching" in his left knee. On July 27, Burks underwent an arthroscopy on his left knee, and Dr. Lyons found no evidence of any "significant" injury. Dr. Lyons also

removed a screw from his left ankle. In October, x-rays of Burks' ankle showed that the "[f]ractures were healing in excellent position."[5]

On March 26, 2002, Burks met with Dr. W.G. Halverson, M.D., for an employment physical. Dr. Halverson noted that Burks' injured left ankle was "holding up well." Dr. Halverson concluded that Burks was a "healthy" employee and placed no restrictions on his ability to work.

On May 3, 2002, Burks had a follow-up visit with Dr. Lyons for orthopedic review. Dr. Lyons noted that both Burks' ankle and knee were "doing pretty good." Dr. Lyons further noted that Burks was "working construction and seems to be coping with this satisfactorily."[6] Dr. Lyons opined that Burks should continue his activities as tolerated, and recommended that he use Ibuprofen as necessary for any discomfort. On July 12, Burks met with Dr. Lyons complaining of knee stiffness and discomfort. Dr. Lyons gave him a cortisone injection in his left knee for treatment. Dr. Lyons noted that Burks was working construction and "copes with it reasonably well."[7] On September 9, 2002, Burks had a follow-up appointment with Dr. Lyons. Dr. Lyons found that since his cortisone shot in July, Burks' knee had "remained in good shape." Upon examination, Dr. Lyons determined that:

> Range of motion in ankle is satisfactory. Scar is well healed. No warmth, no release, no swelling. Left knee demonstrates no fusion. No warmth, no redness. Range of motion, satisfactory. Collateral ligaments are stable.

(Administrative Record at 363.) Dr. Lyons concluded that "overall," Burks is "doing well." Dr. Lyons recommended that he continue his activities as tolerated, including working in construction.

---

[5] *See* Administrative Record at 392.

[6] *See* Administrative Record at 396.

[7] *Id.* at 362.

On July 31, 2003, Burks was evaluated by the Orthopaedics Department at the University of Iowa Hospitals and Clinics. Burks complained of painful arthritis in his left ankle. Upon examination, Burks' ankle was "exquisitely tender to palpation" at the anterior medial aspect of the ankle joint. Burks was diagnosed with post-traumatic ankle arthritis. Ankle fusion, which would be performed by Dr. Annunziato Amendola, M.D., was offered as a treatment option to Burks. On September 10, 2003, Dr. Amendola performed left ankle arthrodesis and removed painful hardware from Burks' ankle. Following surgery, x-rays from October 30, showed "near anatomic alignment of left ankle fusion."[8] At a follow-up appointment in November, Dr. Amendola found that Burks' ankle was healing and improving satisfactorily.

On December 16, 2003, Disability Determination Services ("DDS") referred Burks to Dr. Lorne A. Johnson, Psy.D., for a psychological evaluation. In assessing Burks' activities of daily living, Dr. Johnson determined that:

> [Burks] is able to feed himself, toilet, bathe, but sometimes has trouble getting out of the tub or shower[.] . . . He is able to groom himself, is able to manage his healthcare and is able to dress himself. He does housekeeping chores, such as the laundry, vacuuming, and dishes and is able to care for his clothes. He demonstrates adequate safety skills, is able to use a telephone. He says he is able to manage his money if he had to, but his girlfriend manages the checkbook now.

(Administrative Record at 415.) Upon examination, Dr. Johnson found that Burks was of average to low intelligence. Dr. Johnson noted that he had "significant" delay in his reading abilities compared to his intellectual functioning. Dr. Johnson found no significant emotional problems or psychopathology. Dr. Johnson concluded that Burks was able to:

> remember and understand instructions, procedures, and locations. He is also able to maintain attention, concentration and pace as well as interact appropriately with supervisors, co-workers, and the public. He is fully capable of using good

---

[8] *See* Administrative Record at 409.

7

judgment and responding appropriately to changes in the
workplace.

(Administrative Record at 417.)

On September 7, 2005, Burks met with Dr. Richard A. White, M.D., regarding problems with his left knee. Burks reported that on August 12, 2005, he stepped into a ditch and twisted his left knee. According to Burks, he heard a pop and had immediate swelling in the knee. Dr. White noted that Burks took Aleve for his pain and wore a knee brace at the suggestion of his chiropractor. Burks stated that he could bear weight on his left knee while wearing the brace, but without the brace, his knee felt unstable and caused him pain. Upon examination, Dr. White found mild to moderate effusion on the knee, and tenderness at the medial joint. An MRI showed an ACL tear and a medial meniscal tear in the knee. Burks opted for surgery as treatment.

On September 20, 2005, Burks underwent surgery to repair his left knee. Dr. White performed a left anterior cruciate ligament reconstruction with an Achilles allograft, debridement of the medial meniscal bucket handle tear, and debridement of the bucket handle lateral meniscus tear. Following the surgery, Dr. White noted that the knee was "excellent" and stable.

On November 17, 2005, Burks injured his right hand while holding the bridle of a horse that bucked. X-rays taken on November 18, showed a hairline fracture of the middle phalanx of the middle finger and a comminuted slightly displaced fracture of the proximal phalanx of the ring finger. Burks' fingers were placed in splints. In March 2006, Dr. Gainor found that Burks' fractured fingers were "doing favorably." He had good active range of motion in his fingers with slightly decreased grip.

Also in March 2006, Burks had a follow-up visit with Dr. White regarding his left knee. Burks informed Dr. White that his knee was "doing great." Dr. White released Burks to full duty work as tolerated.

In June 2006, Burks met with John A. Markovitz, N.P., for follow-up on his left knee surgery. Burks informed Markovitz that he was "having some pain at the incision

sites, otherwise he is getting along pretty well. He still has some mild symptoms of popping and catching, but not like they were prior to surgery."[9] Upon examination, Markovitz determined that Burks needed to start quadriceps strengthening exercises and elevate his leg to reduce swelling. Markovitz opined that Burks "may return to work; however, with medium work with no deep squatting, avoid aggressive pivoting or twisting."[10]

On July 11, 2006, Dr. S. Oligschlaeger reviewed Burks' medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Burks. Dr. Oligschlaeger determined that Burks could: (1) occasionally lift and/or carry 50 pounds, (2) frequently lift and/or carry 25 pounds, (3) stand and/or walk with normal breaks for at about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Oligschlaeger also determined that Burks could occasionally climb, balance, stoop, crouch, and crawl, and frequently kneel. Dr. Oligschlaeger found no manipulative, visual, or communicative limitations. Lastly, Dr. Oligschlaeger noted that Burks should avoid concentrated exposure to extreme cold and hazards.

On March 28, 2007, Burks was referred by his attorney to Dr. David T. Volarich, D.O., for an independent medical examination. Dr. Volarich interviewed Burks, examined him, and reviewed his medical records. Upon examination and review of Burks' medical records, Dr. Volarich opined that Burks had permanent partial disabilities of the lower left extremity at the knee and ankle. Dr. Volarich also determined that Burks had a permanent partial disability at the right elbow.[11] Dr. Volarich opined that Burks was able to perform most activities of daily living, and may be able to perform some work

---

[9] *See* Administrative Record at 255.

[10] *Id.* at 256.

[11] Burks fractured his elbow in 1986. When the injury occurred, Burks was jumping off a bridge and into a creek.

9

activities on a limited basis. Dr. Volarich determined that Burks was limited in the ability to work as follows: (1) he should avoid all stooping, squatting, crawling, kneeling, pivoting, climbing, and all impact maneuvers; (2) he should be cautious navigating uneven terrain, slopes, steps, and ladders; (3) he should limit standing to 20-30 minutes or to tolerance; (4) he should minimize repetitive gripping, pinching, squeezing, pushing, pulling, twisting, and rotatory motions; (5) he should avoid impact and vibratory trauma to the hand; and (6) he should not lift/carry more than 10-15 pounds.

On June 5, 2007, Burks was referred by his attorney to Dr. Barbara G. Markway, Ph.D., for a psychological examination. Dr. Markway interviewed Burks and administered several tests to him. Dr. Markway diagnosed Burks with major depressive disorder, single episode, generalized anxiety disorder, history of alcohol abuse, learning disabilities in reading, and chronic pain. Specifically, Dr. Markway found that since his 2005 knee and ankle problems, Burks:

> has become increasingly depressed and anxious[.] . . . He has always worked and now he feels 'useless and worthless.' He has recently started taking an antidepressant medication, but he is not finding it helpful. He currently meets diagnostic criteria for Major Depression as well as Generalized Anxiety Disorder.

(Administrative Record at 456.) Dr. Markway concluded that Burks' 2005 ankle and knee injury substantially contributed to the development of his depression and anxiety. Specifically, Dr. Markway opined that:

> As long as he was able to work as a laborer, he was able to function and support himself independently. Now that he can no longer do that, he feels worthless, hopeless and anxious about the future. Thus, it is my professional opinion . . . that the injury . . . set into motion his decline in mental status. Unless he is able to be retrained, the combination of his psychological conditions, his learning disability, and his physical problems, have rendered him unemployable in the open labor market.

(Administrative Record at 456-57.)

In July 2007, Burks was referred by his attorney to Gary Weimholt, M.S., a vocational rehabilitation specialist, for evaluation. In evaluating Burks, Weimholt interviewed Burks, administered vocational tests, and reviewed Burks' medical history. Weimholt opined that Burks "may be able to perform some work on a temporary basis or on a basis that would be less than full time or gainful employment[.]"[12] Weimholt concluded that:

> [I]t appears that the combination of Mr. Burks['] learning disability, low average IQ, profound reading problems, multiple functional limitations related to the lower extremities, functional limitations to the upper extremities, low level finger dexterity, illiteracy, low aptitude for visual speed and accuracy, history of special education, lack of any transferable job skills or alternative skill sets for productive activity, has resulted for all practical purposes in a total loss of access to the open labor market.

(Administrative Record at 229.)

On October 8, 2007, Burks was referred by DDS to Dr. Craig S. Heligman, M.D., for a consultative medical examination. In an interview with Dr. Heligman, Burks reported that he had the ability to walk 200 yards, stand for 15 minutes, sit as long as he needs to sit, lift and carry 10 pounds, and drive a car. Burks also reported no limitation in the ability to provide self-care, take care of personal hygiene, eat and prepare food, communicate, and take care of his residence. Upon examination, Dr. Heligman noted that:

> [Burks] showed no evidence of discomfort while seated in a chair or on the examination table. [Burks] was able to sit without fidgeting or changing position. He was able to mount and dismount from the examination table without assistance. [Burks] was able [to] remove and put on his shoes and socks and ties [sic] the laces without difficulty.

(Administrative Record at 469.) Dr. Heligman diagnosed Burks with status post left ACL repair and medial and lateral meniscectomy, status post left ankle fracture with surgical

---

[12] *See* Administrative Record at 229.

intervention and arthrodesis, status post right elbow fracture with surgical intervention, dyslexia and learning disability by history, and depression by history. Dr. Heligman concluded that Burks:

> is capable of functioning at the medium level of labor. At that level, there is no restriction in sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, seeing, and traveling. He should avoid squatting and limited from prolonged kneeling.

(Administrative Record at 471.) Dr. Heligman also opined that "[t]here are no work-related activities including understanding and memory, sustained concentration and persistence, social interaction, or adaptation that cannot be performed by [Burks]."[13]

## B. Burks' Education and Employment Background

Burks was born in 1966. He completed the twelfth grade. He testified that when he was in school, he had difficulty with reading, writing, and performing arithmetic.

The record contains a detailed earnings report for Burks. The report covers Burks' employment history from 1990 to 2006. According to the report, Burks earned between $196.00 (2003) and $19,108.51 (1998). He has no earnings since 2007.

## C. Burks' Administrative Hearing Testimony

At the time of the administrative hearing, the ALJ inquired whether Burks was capable of working at a "sit down job." Burks answered that he did not believe he could work at a sit-down job because sitting caused pain in his ankle and knee. Burks also stated that he had difficulty gripping due to fractures he sustained in two fingers.

Burks' attorney also questioned Burks regarding his functional capabilities:

> Q:   Okay. You talked about doing sit down work. Do you
>       think you could sit for eight hours and use your fingers
>       and hands to do any kind of work?
> A:   No, I don't.
> Q:   Okay. How about being on your feet?
> A:   No. I don't stand very long.

---

[13] *See* Administrative Record at 472.

| Q: | Okay. When you say -- |
|---|---|
| A: | -- my ankle would give out on me and stuff. So -- |
| Q: | Okay. Do you have pain in your ankle? |
| A: | Yes, I do. |
| Q: | Okay. Where else do you have pain? |
| A: | In my knee. |
| Q: | Which one? |
| A: | My left knee right under the kneecap. It always -- it pops and hurts and everything. |

(Administrative Record at 54.)

## V.  CONCLUSIONS OF LAW

### A.  ALJ's Disability Determination

The ALJ determined that Burks was not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v.*

*Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Burks had not engaged in substantial gainful activity since April 26, 2006. At the second step, the ALJ concluded from the medical evidence that Burks had:

> a history of degenerative changes in the left ankle and left knee requiring surgical corrections. [Burks] has a history of a right upper extremity/elbow fracture requiring surgical correction. [Burks] has a history of fractures of right fingers. [Burks] has a history of a learning disability with reading difficulties. [Burks] has history of an adjustment disorder and recent diagnoses of a generalized anxiety disorder and a major depressive disorder. [Burks'] impairments are severe in combination. [Burks'] mental impairments of anxiety and depression have not been severe impairments on a 12-month durational basis.

(Administrative Record at 19.) At the third step, the ALJ found that Burks did not have an impairment or combination of impairments listed in "20 C.F.R. [§] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments)]." At the fourth step, the ALJ determined Burks' RFC as follows:

> [Burks] can lift and carry twenty-five pounds frequently and fifty pounds occasionally. [Burks] is without significant

14

> limitations with respect to reaching, feeling, handling,
> rotating, grasping, and pinching. [Burks] can occasionally
> kneel for extended periods of time. He can occasionally
> crawl. He can climb and bend. . . . [E]ven if . . . significant
> benefit of the doubt is given to [Burks'] testimony and
> allegations, the undersigned finds [Burks] can still lift and
> carry ten pounds frequently and twenty pounds occasionally.

(Administrative Record at 19.) Also at the fourth step, the ALJ determined that Burks

could not perform any of his past relevant work. At the fifth step, the ALJ determined that

based on his age, education, previous work experience, and RFC, Burks could work at

jobs that exist in significant numbers in the national economy.[14] Therefore, the ALJ

concluded that Burks was not disabled.

## B. Objections Raised by the Substituted Party

Miller argues that the ALJ erred in three respects. First, Miller argues that the ALJ

failed to give sufficient weight to the opinions of Drs. Volarich and Markway regarding

Burks' physical and mental limitations. Second, Miller argues that the ALJ failed to give

sufficient weight to the opinions of Gary Weimholt, a vocational rehabilitation specialist.

Lastly, Miller argues that the ALJ failed to properly evaluate Burks' subjective allegations

of pain and disability.

## 1. The Opinions of Burks' Examining Sources

An ALJ is required to evaluate every medical opinion he or she receives from a

claimant. 20 C.F.R. §§ 404.1527(d), 416.927(d). If the medical opinion is not from a

treating source, then the ALJ considers the following factors for determining the weight

to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating

relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors."

*Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to

---

[14] At the fifth step, instead of relying on vocational expert testimony, the ALJ took
administrative notice of certain federal rules and regulations to support his finding that
Burks could perform unskilled, light, and medium work in the national economy. *See*
Administrative Record at 26-27.

resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

### a. *Dr. Volarich*

Miller argues that the ALJ failed to properly evaluate the opinions of Burks' examining physician, Dr. Volarich. Specifically, Miller argues that the ALJ's reasons for discounting Dr. Volarich's opinions are not supported by substantial evidence on the record. Miller maintains that this matter should be reversed and remanded for further consideration of the opinions of Dr. Volarich.

In his decision, the ALJ thoroughly considered and discussed Burks' medical history.[15] In particular, the ALJ considered and addressed Dr. Volarich's opinions in the context of Burks' overall medical history and Burks' own description of his limitations. Specifically, the ALJ determined that:

> Dr. Volarich's opinions are inconsistent with the many aforementioned medical facts which detract from, or fail to enhance, [Burks'] allegations. His findings appear inconsistent with the many non-medical facts which detract from, or fail to enhance, [Burks'] allegations. His findings appear inconsistent with the above noted claimant's statements, the diagnostic test results and objective medical clinical findings within the 2003 consultative psychological evaluation and the medical treatment records from Saint Joseph's Hospital, the Mercy Medical Center, the Family Health Center and the University Hospital and Clinics. His findings appear inconsistent with the findings within the Work Center progress report which noted that [Burks] displayed abilities to lift and carry that fell within the medium to heavy work activities. His findings appear inconsistent with Dr. Heligman's objective findings. His findings appear inconsistent with [Burks'] statements regarding

---

[15] *See* Administrative Record at 20-27 for the ALJ's extensive and exhaustive discussion of Burks' medical history.

resolution of symptoms within the treatment notes. His findings appear inconsistent with the overall lack of medical treatment aggressively and frequently sought and received for any left ankle and right elbow complaints since at least the alleged onset date. His findings appear inconsistent with the overall lack of medical treatment aggressively and frequently sought and received for left knee complaints since late 2006/early 2007. His opinions appear inconsistent with, or undermined by, the overall objective medical findings within the treatment notes and the above noted medical and non-medical facts. The above facts seriously undermine any weight accorded to Dr. Volarich's findings. Much greater weight is given to the treating medical professionals and to [Burks'] demonstrated abilities discussed above.

(Administrative Record at 27.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Volarich. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Volarich's opinions and explaining inconsistencies between Dr. Volarich's opinions and the record as a whole. *See Wagner*, 499 F.3d at 848; 20 C.F.R. § 404.1527(d)(2). Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### b. *Dr. Markway*

Similar to Dr. Volarich's opinions, Miller argues that the ALJ failed to properly evaluate the opinions of Burks' examining psychologist, Dr. Markway. Specifically, Miller argues that the ALJ's reasons for discounting Dr. Markway's opinions are not supported by substantial evidence on the record. Miller maintains that this matter should be reversed and remanded for further consideration of the opinions of Dr. Markway.

As previously stated, the ALJ thoroughly considered and discussed Burks' medical history.[16] In particular, the ALJ considered and addressed Dr. Markway's opinions in the context of Burks' overall medical history and Burks' own description of his limitations. Specifically, the ALJ determined that:

> Dr. Markway's findings are not based upon treatment of [Burks] but a one-time evaluation. Her findings appear inconsistent with the medical treatment notes which do not document ongoing complaints of uncontrollable and severe anxiety or depression. Her findings appear inconsistent with the fact that medical treatment notes do not document ongoing findings of distress. Her findings appear unsupported by, and inconsistent with, the fact that the medical treatment records do not document medical observations, by any treating psychiatrist or psychologist, of significant abnormalities or deficits with [] respect to [Burks'] mood, affect, thought processes, concentration, attention, pace, persistence, social interaction, activities of daily living, speech, psychomotor activity, focus, contact with reality, eye contact, orientation, demeanor, abilities to cope with stress, abilities to work without decompensation, abilities to understand and follow instructions, judgment, insight, cognitive function or behavior. The medical treatment notes do not document findings, by a treating psychiatrist or psychologist, of any significant limitations of function, lasting twelve months in duration and despite treatment, since the alleged onset date. Her findings appear inconsistent with the lack of documentation of ongoing mental health treatment sought and received. Her findings must be considered in light of the fact that [Burks] engaged in substantial gainful activity for more than one decade despite any learning disability. The above facts seriously undermine any weight accorded to Dr. Markway's findings.

(Administrative Record at 28.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Markway. The Court also finds that

---

[16] *See* Administrative Record at 20-27 for the ALJ's extensive and exhaustive discussion of Burks' medical history.

the ALJ provided "good reasons" for rejecting Dr. Markway's opinions and explaining inconsistencies between Dr. Markway's opinions and the record as a whole. *See Wagner*, 499 F.3d at 848; 20 C.F.R. § 404.1527(d)(2). Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. The Opinions of Gary Weimholt, Vocational Rehabilitation Specialist

Miller argues that the ALJ failed to properly evaluate the opinions of Gary Weimholt, a vocational rehabilitation specialist. Specifically, Miller argues that the ALJ's reasons for discounting Weimholt's opinions are not supported by substantial evidence on the record. Miller maintains that this matter should be reversed and remanded for further consideration of the opinions of Weimholt.

As a vocational rehabilitation specialist, the Social Security Administration ("SSA") considers Weimholt an acceptable, non-medical source. *See* 20 C.F.R. § 404.1513(d); *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (non-medical sources include rehabilitation counselors). Social Security Ruling 06-03p explains how the SSA considers opinions from sources not classified as "acceptable medical sources," or "other non-medical sources." *See Id.* SSR 06-03p provides that when considering the opinion of a source that is classified as an other, non-medical source, such as a rehabilitation counselor, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the
> existence of a medically determinable impairment, according
> to SSR 06-3p. Instead, there must be evidence from an

'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06-03p).

In considering Weimholt's opinions, the ALJ noted that:

Mr. Weimholt's findings appear heavily based upon the opinions of Dr. Volarich and Dr. Markway and [Burks'] response to testing. For the many reasons the opinions of Drs. Volarich and Markway are undermined by the remainder of the record, so too are the opinions of Mr. Weimholt.

(Administrative Record at 28.) While the ALJ does not discuss Weimholt's opinions as thoroughly as the opinions of Drs. Volarich and Markway, the ALJ points out that Weimholt's opinions rely heavily on the opinions of Drs. Volarich and Markway, which the ALJ properly discounted as inconsistent with the record as a whole. Therefore, the ALJ's conclusion that Weimholt's opinions are inconsistent with the evidence in the record is supported by his findings regarding the opinions of Drs. Volarich and Markway. The Court bears in mind that while an ALJ is required to fully and fairly develop the record, he or she "'is not required to discuss every piece of evidence submitted.'" *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Furthermore, failure of an ALJ to cite specific evidence is not an indication that he or she failed to consider such evidence. *Id.* Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Weimholt's opinions in accordance with SSR 06-03p. The ALJ fully and fairly developed the record with regard to Weimholt's opinions, as evidenced by the ALJ's conclusion that "[f]or the many reasons the opinions of Drs. Volarich and Markway are undermined by the remainder of the record, so too are the opinions of Mr. Weimholt." Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ

because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3.  *Credibility Determination*

Miller argues that the ALJ failed to properly evaluate Burks' subjective allegations of pain and disability. Miller maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Burks' testimony, and properly evaluated the credibility of his subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The absence of objective medical evidence to support a claimant's subjective complaints is also a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). The ALJ, however, may not disregard a claimant's subjective complaints "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322; *see also Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claim because they are not fully supported by medical evidence.").

Instead, "'[a]n ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence,

but the complaints may be discounted based on inconsistencies in the record as a whole.").
If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the
reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v.
Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642,
647 (8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998)
("When rejecting a claimant's complaints of pain, the ALJ must make an express
credibility determination, must detail reasons for discrediting the testimony, must set forth
inconsistencies, and must discuss the *Polaski* factors."). Where an ALJ seriously
considers, but for good reason explicitly discredits a claimant's subjective complaints, the
Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d
1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see
also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility
determination is warranted if the determination is supported by good reasons and
substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ
explicitly discredits the claimant's testimony and gives good reasons for doing so, we will
normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's
subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*,
499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

The ALJ's decision provides an exhaustive discussion of the inconsistencies between
Burks' subjective allegations of disability and the record as a whole.[17] Therefore, the
Court will limit its discussion to the pertinent determinations made by the ALJ in analyzing
Burks' credibility. In his decision, the ALJ found that:

> [D]espite any allegations of severe and disabling mental
> impairments, the prior consultative psychological evaluation in
> December 2003 resulted in findings that [Burks] was capable
> of remembering and understanding instructions, procedures
> and locations. He was found able to maintain attention,

---

[17] *See* Administrative Record at 20-27.

concentration and pace as well as appropriately interact with others. He was found capable of responding to work place changes. Intelligence quotient scores ranged from 83 to 98. The above objective findings are inconsistent with allegations of disabling or even severe mental impairments. . . .

Family Health Center treatment notes document that on September 25, 2006, [Burks] indicated, per his self-report during inventory testing, only 'minor' depression. Improved sleep and depression were noted on October 23, 2006. [Burks] was in no acute distress. He was alert and oriented. He was sleeping better with overall improved depression. The health center's treatment notes do not document ongoing mental complaints as of January 22 and February 1, 2007. The above noted treatment notes are inconsistent with allegations of a severe mental impairment.

(Administrative Record at 20.) The ALJ also thoroughly discussed Burks' medical records regarding his ankle and knee problems,[18] and concluded that:

[T]he above treatment notes also include objective medical findings and statements which establish significant improvement or near resolution of [Burks'] symptoms within twelve months of the more recent surgery and certainly within a few months of the alleged onset date. The findings that [Burks] was capable of a significant range of medium work within two months of the alleged onset date is inconsistent with [Burks'] allegations of a disabling impairment lasting twelve months in duration. The above medical treatment notes seriously undermine any allegations of disabling physical impairments.

(Administrative Record at 21-22.) The ALJ also determined that:

[Burks'] statements regarding recovery from the finger fractures are inconsistent with allegations of a severe impairment lasting twelve months in duration. [Burks'] demonstrated capabilities, within a few months after onset, are extremely inconsistent with allegations of disabling impairments. The finding that [Burks] is capable of heavy

---

[18] *Id.* at 21.

work is also inconsistent with allegations of disabling impairments. The above noted facts seriously undermine [Burks'] credibility regarding disabling impairments. The questionable effort portrayed by [Burks] also undermines credibility. . . .

Despite complaints of allegations of disabling mental and physical impairments, [Burks] was repeatedly noted to be in no acute distress. The above noted objective medical findings, facts and [Burks'] statements are inconsistent with, and detract from, allegations of disability. . . .

There is no medical evidence that [Burks] was prescribed, or determined to require, the prolonged use of an assistive device such as a cane or brace for the purpose of ambulation, motion, or immobilization, for twelve consecutive months, since the alleged onset date. The medical records do not document the presence of long term and significant atrophy or loss of muscle tone. [Burks] was not frequently reported to be in acute distress. He was not reported to exhibit significant pain behaviors or signs in the forms of abnormal breathing, uncomfortable movement or elevated blood pressure. . . . The record noted below indicates complaints of pain inconsistent with objective findings. The medical records do not document any physician's findings that [Burks] has had persistent and adverse side effects due to his prescribed medication, resulting in significant limitations of his functional capacity, which were incapable of being controlled by medication adjustments or changes. . . .

[Burks] has alleged many significant limitations of daily activities. However, allegations of disability are not self-proved by accompanying allegations of limited activities. Allegations of limited daily activities are mere reflections and extensions of allegations of disability. For the many reasons and factors that [Burks'] allegations of disability are found not credible, so too are [Burks'] allegations of severely limited daily activities found not credible.

(Administrative Record at 22-25.)

It is clear from the ALJ's decision that he considered and discussed Burks' treatment history, medical history, functional restrictions, effectiveness and side effects of medications, and activities of daily living in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Burks' subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Burks' subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ properly weighed, considered, and addressed the opinions of Burks' examining sources, Drs. Volarich and Markway. The ALJ also properly considered and addressed the opinions of Weimholt, a vocational rehabilitation specialist. Lastly, The ALJ properly determined Burks' credibility with regard to his subjective complaints of pain and disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1.     The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.     Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this __5^th__ day of November, 2010.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA